John LELSZ, et al., Plaintiffs,

v.

John J. KAVANAGH, et al., Defendants,

v.

**PARENT ASSOCIATION FOR THE RETARDED OF TEXAS, et al., Intervenor-Applicants.**

**No. S–74–95–CA.**

United States District Court,
E.D. Texas,
Sherman Division.

Oct. 21, 1982.

Joselle Albracht, No. Central Texas Legal Serv. Fdn., Dallas, Tex., David Ferleger, Philadelphia, Pa., Alice Bussiere, Texas Legal Services Center, Austin, Tex., for plaintiffs.

Martha Allan, Asst. Atty. Gen., Austin, Tex., Alexander M. Haw, Waco, Tex., B.F. Campbell, Jr., Dallas, Tex., H. Bartow Farr, III, Joel I. Klein, Paul Smith, Washington, D.C., for proposed intervenors.

Dayle Bebee, James C. Todd, Renea Hicks, Advocacy, Inc., Austin, Tex., for Advocacy, Inc., amicus curiae.

Janice L. Green, Austin, Tex., for Ass'n for Retarded Citizens/Texas, amicus curiae.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

On March 30, 1982, this court denied without opinion the motion to intervene of the Parent Association for the Retarded of Texas and others ("P.A.R.T."). The intervenors appealed that ruling under 28 U.S.C. § 1291. On September 20, 1982, in order to facilitate a determination of the merits of the intervenors' appeal, the Fifth Circuit ordered "a Limited Remand for Entry of Written Reasons as to the Denial of Motion to Intervene." This Memorandum Opinion is written in compliance with that order.

### I.

### *History of the Motion to Intervene*

This case commenced on November 27, 1974, as a class action civil rights injunctive suit challenging the adequacy of conditions, care and habilitation at Texas institutions for the mentally retarded. An Amended Complaint was filed on March 15, 1975, and a final, thirty-six page Second Amended Complaint was filed on February 27, 1979, alleging violations of state and federal law touching upon every aspect of life within the Austin, Denton, and Fort Worth State Schools for the Mentally Retarded.

On March 5, 1976, six members of the proposed class, acting by and through their parents, moved to intervene seeking a "dismissal of the law suit on the basis that it does not state a claim upon which relief can be granted, or, alternatively, on other grounds stated in Defendants' Answer." Intervenors' Pleading, March 2, 1976, p. 10. These applicants wished to participate in order to argue that they had "no Constitutional right to habilitative care, much less habilitative care in the least restrictive setting . . . [and a]lternatively, if such a right exists, intervenors contend that the care provided by the State meets the Constitutionally compelled minimal standards." Intervenors' Pleadings, p. 2. The main fear of the intervenors was that the state institutions might be closed and replaced by either community-based residential facilities or by nothing at all. This motion was denied (with a written statement of reasons) on July 9, 1981, because the interests of the intervenors were adequately represented by the defendants. *See* Order, July 9, 1981, appended to this opinion.

At the same time that these six class members had moved to intervene, they had also moved for an order determining that the suit could not be maintained as a class action, or, in the alternative, that if it could be maintained as a class action, that they should be the class representatives. The crux of the intervenors' position was, again, their fear that the institutions would be closed. In their Memorandum of Law opposing class certification, the applicants argued that "should the costs of implementing the constitutional right Plaintiffs assert become unreasonably burdensome, the State would be free to *abandon entirely* the provision of any and all such services to the mentally retarded as are now enjoyed by residents of the state schools." Intervenors' Memorandum of Law in Support of Motion for an Order Determining that Plaintiffs' Action Cannot Be Maintained as a Class Action," p. 2. They argued that the "fashioning of such a 'right' [to habilitation] would ultimately work to their detriment by depriving them of needed state school services." *Ibid.,* p. 3.

This court, after hearing oral argument and considering intervenors' brief, decided to certify the plaintiffs as class representatives. Plainly, to have certified intervenors as class representatives would have simply sabotaged the suit, since the intervenors claimed to have no pertinent constitutional or legal rights and no cause of action. For a variety of reasons that will be detailed below in regard to the motion currently before the court, it was also felt that the interests of the intervenors could be adequately protected by means other than denying class certification to the plaintiffs. The most direct means of protecting their interests was to grant them leave to file briefs amicus curiae during the pendency of the action. The court invited such briefs in the same Order (July 9, 1981) that denied the applicants' motion to intervene.

The intervenors never filed amicus briefs, however. They appealed to the Fifth Circuit the order denying them intervention and, then, on September 28, 1981, they withdrew that appeal.

On February 10, 1982, a new, more artfully drafted motion to intervene was filed, this one by two class members, by and through their parents, and by the Parent Association for the Retarded of Texas ("P.A.R.T."), a non-profit organization comprised of "a substantial number" of parents, relatives, and guardians of class members who "oppose[] efforts to close the schools and to force residents into community facilities." Complaint in Intervention, pp. 1–2. Unlike the previous set, these applicants did not simply pray for dismissal of the suit. Rather, they professed a sympathy for the plaintiffs' goals that set them apart from the defendants, while they still opposed efforts to close any of the schools:

Intervenors ... bring this complaint to require that defendants bring the Austin, Denton and Fort Worth State Schools for the mentally retarded into compliance with governing constitutional standards. Intervenors oppose, however, efforts to close the schools and to force transfer of all school residents into untested community facilities.

Motion to Intervene, p. 1. However, the total substance of the new intervenors' differences with the defendants reduced to this sentence:

Although intervenors are without adequate information to vouch for the accuracy of [portions of plaintiffs' factual allegations], intervenors believe that, to the extent that plaintiffs are able to prove a failure by defendants to provide adequate care and habilitation, the deficiencies can and must be corrected.

Complaint in Intervention, p. 3, ¶ 6.

This acquiescence in portions of the plaintiffs' case is what the new applicants say distinguishes them from the defendants, who "flatly deny all allegations concerning deficiencies at Austin, Denton and Fort Worth Schools." Memorandum of Points and Authorities in Support of Motion to Intervene, pp. 3, 11. The focal concern of these applicants, like their predecessors, is their fear that the institutions will be closed and that the class members will be forced out of the "protected, structured environ-

ment" of large institutions into "less structured" and "untested" community-based residential facilities. Complaint in Intervention, pp. 1, 3, ¶¶ 1, 7, 8. On the other hand, intervenors do not claim any legal right to a large institutionalized setting:

> While intervenors believe that the Constitution does embody a right to individualized treatment as well as decent care, we think that the states are then free to choose among the various facilities providing such treatment and care.

Memorandum . . . in Support of Motion to Intervene, p. 10.

A close affinity between the earlier intervenor-applicants and the current applicants was apparent to the court both from the substance of the motions filed and from the names involved. P.A.R.T. now concedes that the initial intervention was financed and supported by P.A.R.T., and that all but one of the initial intervenors were members of P.A.R.T. Brief for Appellants (to the Fifth Circuit), p. 25, n. 19. *See also,* Brief for Appellees, Exhibits B, C, D. The P.A.R.T. motion to intervene acknowledged the close affinity between itself and the previous applicants, and even appeared to concede that the two groups were effectively identical. In the Memorandum in support of their motion the P.A.R.T. applicants complained that "it has been variously suggested that the interests of intervenors are somehow served by *both* plaintiffs and defendants." Memorandum . . . in Support of Motion to Intervene, p. 7. Although the antecedent of "intervenors" in that sentence is the P.A.R.T. applicants, the rest of the sentence refers to the denials of the earlier applicants' motion to intervene (because their interests were adequately represented by defendants) and of the earlier applicants' motion for an order denying class certification (because the interests of class members were adequately represented by the plaintiffs). Similarly, in their briefs to the Fifth Circuit, although not in this court, the P.A.R.T. applicants have argued that their application is timely, despite its filing six years after they had actual knowledge and appreciation of the suit's potential impact upon them, because they believed that the pending motions of the previous intervenor-applicants fully represented P.A.R.T.'s interests from March 1976 until their denial in July and August, 1981. Reply Brief for Appellants, pp. 9–10, and n. 13. The plaintiffs requested court permission to propound interrogatories to P.A.R.T. to explore more fully its connection to the previous intervenors, but since the court had decided to deny P.A.R.T.'s motion on the merits, and not upon *res judicata* grounds, it considered such documentation superfluous.

For the reasons set forth at length below, the court decided that the P.A.R.T. applicants' interests were "adequately represented by existing parties," and that they were, therefore, not entitled to intervene as of right. Fed.R.Civ.P. 24(a)(2). Furthermore, because the court found that these applicants' motion presented essentially the same questions as the previous applicants' motions for intervention and for an order denying class certification, and because these applicants had actual knowledge of those previous motions and of the reasons for their denial, and because these applicants were essentially the same persons as the previous intervenors, and because the court felt that these applicants had refused to go through the normal appellate channels but had instead chosen simply to draft a new, more artful but less candid motion to intervene, the court took the unusual action of denying that motion without an opinion. The decision to append no written statement of reasons was not connected to any formal theory of *res judicata,* but reflected a pragmatic and, perhaps, hasty, judgment about wise allocation of time by a district judge who had before him 770 *other* pending civil actions. However, upon sober reconsideration of the serious questions implicated in any denial of a purported intervention as of right, and of the indispensability of providing a record for appellate review, and because it has been ordered to do so by the Fifth Circuit, the court now sets down its reasoning in denying the P.A.R.T. application for intervention.

## II.

*Reasons for Denial of Motion to Intervene*

██ The P.A.R.T. intervenor-applicants are entitled to neither intervention as of right nor permissive intervention because their interests are adequately represented by existing parties. Specifically,

(a) P.A.R.T.'s interest in preventing replacement of institutional settings by community-based residential facilities—to the extent that it is legally cognizable at all—is adequately represented by the defendant officials of the Texas Department of Mental Health and Mental Retardation who are existing parties to this suit;

(b) P.A.R.T.'s interest in improving conditions at these schools, to the extent that it has such a good faith interest, is, by the terms of its own pleadings, adequately represented by the plaintiffs, since that portion of its "Complaint in Intervention" is wholly duplicative of portions of plaintiffs complaint;

(c) P.A.R.T.'s further interest, if any, in making the court aware of any legal theories, facts, or factual interpretations that existing parties, amici curiae, and the court-appointed expert fail to present will be adequately served by permitting P.A.R.T. to file briefs amicus curiae, which the court has already permitted in its Order of July 9, 1981. (Since the court has already expressed its views on the close affinity between the P.A.R.T. intervenors and the previous intervenors, it interprets that previous order to permit the submission of amicus briefs by either the P.A.R.T. applicants or the previous applicants or both.)

If the P.A.R.T. intervenors are or must be deemed to be completely independent of the previous intervenors, the court further finds that, not only are their interests adequately represented by existing parties but that their motion is untimely.

A. *The P.A.R.T. applicants' interest in preventing replacement of institutional settings with community-based settings—to the extent that it is legally cognizable at all—is adequately represented by defendants.*

Rule 24(a) of the Federal Rules of Civil Procedure provides in pertinent part:

(a) *Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

According to the Advisory Committee that drafted Rule 24(a)(2), the representation in question need only be practical, not "formal":

The representation whose adequacy comes into question under the amended rule is not confined to formal representation like that provided by a trustee for his beneficiary or a representative party in a class action for a member of his class. A party to an action may provide practical representation to the absentee seeking intervention although no such formal relationship exists between them, and the adequacy of this practical representation will then have to be weighed. [Citations omitted.]

Fed.R.Civ.P. 24, Advisory Comm. Note, 39 F.R.D. 109, 110–111 (1966).

In 1966, when Rule 24(a)(2) was drafted in its present form, the Advisory Committee also considered a proposal that would have allowed adequacy of representation to be completely determined by the intervenor. The intervenor's willingness to bear the costs of litigation would have been evidence enough that he was receiving inadequate representation. This proposal was rejected. The Reporter for the Advisory Committee subsequently explained why:

It might be objected that the "unless" clause is *de trop,* because the applicant should be his own judge of whether his interest is being adequately represented; but that would break in rudely on ideas of fiduciary representation and contribute, besides, to a cluttering of lawsuits

with multitudinous useless intervenors.... [T]he question of representation and its adequacy ... is to be decided without fetishes of form—thus representation may be adequate even though it is not formal—and with due attention to the character of the litigation and to its condition at the time of the application to intervene.

Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 403 (1967). The interests of the applicants must, therefore, be balanced against the interest of the original parties in "the prompt disposition of their controversy" and against the interest of the public in "efficient disposition of court business." 7A Wright and Miller, Federal Practice and Procedure ¶ 1904 at 474 (1972).

The P.A.R.T. intervenor-applicants are primarily concerned with keeping the three large Texas institutions for the mentally retarded open, and ensuring that they are not replaced by "untested" and "less structured" community-based residential facilities. The defendants, who operate those three institutions, have manifested a desire and intent to keep those institutions open for precisely the same reasons intervenors argue that they should be kept open: because they believe those institutions offer appropriate care or habilitation for certain kinds of mentally retarded people. Defendants' Answer to Second Amended Complaint, ¶ 25 ("Defendants ... admit that Plaintiffs and other mentally retarded persons have varying degrees of potential and Defendants admit that the mentally retarded's capacity for benefiting from any form of treatment varies by individual, social, emotional and economic need. Defendants deny that no mentally retarded person requires institutionalization."); ¶ 31 ("Again Defendants assert that mentally retarded persons have individual needs and that the families of mentally retarded persons also vary in their abilities to provided [sic] the necessary support mechanisms for life in a community setting. Defendants deny that the simplistic approach embodied in allegations in paragraphs 65, 66 and 67 of Plaintiff's [sic] [Second] Amended Complaint can be applied across the board to all mentally retarded persons who vary greatly in their needs."); ¶ 35 ("Defendants deny the allegations of paragraph 71 in their entirety as they constitute a blanket simplistic approach which assumes that all residents of state schools are equal in abilities and suffer from the same disabilities."); ¶ 89 ("denys [sic] that any statements may be made in the form of generalizations which would apply to each and every mentally retarded person"), ¶¶ 90, 91, 92 (denying the four paragraphs of plaintiffs' complaint alleging the "inevitable failure of Institutions." Second Amended Complaint, ¶¶ 124–128).

The defendants in this case are the Commissioner of the Texas Department of Mental Health and Mental Retardation, the Acting Commissioner for Mental Retardation Services, the members of the Texas Board of Mental Health and Mental Retardation, and the Superintendent of each of the three state schools challenged in the suit, all of whom are being sued in their official capacities. They are represented by the Attorney General of Texas, who is the "chief law officer of the state," one of whose principal functions is "representing the state in civil litigation." Tex.Const. art. 4, ¶ 22, Interpretive Commentary (Vernon 1955).

Courts are in agreement that "in the absence of a very compelling showing to the contrary, it will be assumed that ... a state adequately represents the interest of its citizens, and that a school board adequately represents the patrons of a school." 7A Wright and Miller, Federal Practice and Procedure § 1919 at 528–529 (1972), *Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania,* 674 F.2d 970 (3d Cir.1982); *Environmental Defense Fund, Inc. v. Higginson,* 631 F.2d 738, 740 (D.C. Cir.1979); *Commonwealth of Pennsylvania v. Rizzo,* 530 F.2d 501, 505 (3d Cir.1976), *cert. denied,* 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976); *United States v. South Bend Community School Corporation,* 511 F.Supp. 1352, 1358 (N.D.Ind.1981); *Moore v. Tangipahoa Parish School Board,* 298

F.Supp. 288, 292 n. 10 (E.D.La.1969). As the court in *Moore* held:

> When intervenors claim they are not being adequately represented by the Government, courts should be very hesitant to hold such representation inadequate, "at least in the absence of any claim of bad faith or malfeasance on the part of the Government ..." *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 689 [81 S.Ct. 1309, 1312, 6 L.Ed.2d 604] ... (1961).

298 F.Supp. at 292 n. 10. *See also Blocker v. Board of Educ. of Manhasset,* 229 F.Supp. 714, 715 (E.D.N.Y.1964) ("representation by the governmental authorities is considered adequate in the absence of gross negligence or bad faith on their part," quoting 4 Moore, Federal Practice ¶ 24.08 at 43 (2d ed. 1963)); *British Airways Board v. Port Authority of New York and New Jersey,* 71 F.R.D. 583 (S.D.N.Y.1976) (airline sued port authority challenging the latter's order prohibiting supersonic transports; motions to intervene by towns, community groups, environmental associations and residents near runway were denied when there was no showing of collusion, adversity of interest, possible nonfeasance, or incompetence that would prevent Port Authority from adequately representing applicants' interests).

The intervenor-applicants have made absolutely no showing that the defendants will not and are not now conscientiously and vigorously representing their interest in resisting the closing of the three state institutions. In the closely analogous situation of civil rights injunctive suits filed to achieve school desegregation, the Fifth Circuit has over and over and over again failed to find a right to intervene by various groups of children or parents or teachers who argued that the defendant state officials were not adequately representing their interests. *Valley v. Rapides Parish School,* 646 F.2d 925, 926, 941 (5th Cir.1981) (parents opposing closing of school); *Pate v. Dade County School Bd.,* 588 F.2d 501, 503 (5th Cir.1979) (parents opposing school pairing); *United States v. Marion County School District,* 590 F.2d 146 (5th Cir.1979)

(parents and teachers opposing school closing); *United States v. Perry County Bd. of Educ.,* 567 F.2d 277 (5th Cir.1978) (parents opposing proposed location of new school); *Cisneros v. Corpus Christi Independent School District,* 560 F.2d 190 (5th Cir.1977), *cert. denied,* 434 U.S. 1075, 98 S.Ct. 1265, 55 L.Ed.2d 781 (1978); *Jones v. Caddo Parish School Bd.,* 487 F.2d 1275 (5th Cir.1975) (parents opposing school closing); *St. Helena Parish School Bd. v. Hall,* 287 F.2d 376, 379 (5th Cir.1961), *cert. denied,* 368 U.S. 830, 82 S.Ct. 52, 7 L.Ed.2d 33 (white child denied intervention). *See Bennett v. Madison County Bd. of Educ.,* 437 F.2d 554 (5th Cir.1970) (teachers denied intervention); *Horton v. Lawrence County Bd. of Educ.,* 425 F.2d 735, 736 (5th Cir.1970) (teachers denied intervention). *Accord: United States v. Board of School Commissioners of Indianapolis,* 466 F.2d 573 (7th Cir.1972) (parents, students adequately represented by school board); *Spangler v. Pasadena City Bd. of Educ.,* 427 F.2d 1352 (9th Cir. 1970) (parents adequately represented by school board); *United States v. South Bend Community School Corporation,* 511 F.Supp. 1352, 1358–1359 (N.D.Ind.1981) (NAACP cannot intervene because U.S. represents its interests, and parents cannot intervene because school board represents their interests). *But see Smuck v. Hobson,* 408 F.2d 175 (D.C.Cir.1969). (The Fifth Circuit has consistently refused to follow *Smuck. See, e.g., Perry County,* supra, at 279; *Pate,* supra, at 503.)

Moreover, the P.A.R.T. applicants have not alleged that the retarded children they represent have a legal right to be kept in an institutional setting as opposed to a residential community-based facility. Rather, their position is this:

> While intervenors believe that the Constitution does embody a right to individualized treatment as well as decent care, we think that the states are then free to choose among the various facilities providing such treatment and care. *Pennhurst State School v. Halderman,* [451 U.S. 1] 101 S.Ct. 1531, 1558–59 [67 L.Ed.2d 694].

Memorandum ... in Support of Motion to Intervene, p. 10. By this reasoning, even if there were any evidence of a failure by the state to resist the most extreme forms of relief requested by plaintiffs, the applicants' only recourse would be to make their objections known to the Texas Department of Mental Health and Mental Retardation, and not to this court. Again, in the school desegregation cases, the Fifth Circuit has always denied intervention as of right to parents who argued that their school boards were not resisting civil rights suits with sufficient fervor. As the Fifth Circuit has held, "Appellants are not entitled to intervention of right simply because they would have voted differently had they been members of these representative bodies [the school board and a bi-racial committee]." *United States v. Perry County Bd. of Educ.,* 567 F.2d at 280. *See Jones v. Caddo Parish School Board,* 487 F.2d at 1277.

> In the context of public school desegregation there are innumerable instances in which children, parents, and teachers may be deprived of various "rights" (e.g., the "right" to attend a neighborhood school) without having had the opportunity to participate directly in the judicial proceedings which divest them of those "rights." When these adversely affected groups have sought to intervene, we have frequently declined to permit it. [Citations omitted.]

*Perry County,* 567 F.2d at 279. Just as there is no "right" to a neighborhood school, it is intervenors' own position that there is no "right" to an institutional setting as opposed to a community-based residential treatment setting, assuming both provide individualized treatment and decent care. Accordingly, if state authorities should choose not to protect such a right, intervenors would have suffered no legally cognizable wrong. If, on the other hand, either setting—institutional or community-based—were to prove constitutionally or statutorily infirm with respect to any class member, the court could neither order relief nor approve a settlement that countenanced such conditions. Within these legal bounds the Texas authorities would have broad powers to formulate their own policies, and would certainly be permitted to fashion broader relief than was constitutionally or statutorily required if they desired. *Cf. Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("School authorities are traditionally charged with broad power to formulate educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole."); *United States v. South Bend Community School Corp.,* 511 F.Supp. at 1356.

Finally, regardless of who the parties are and what positions they take, relief is fashioned by the court, not by the parties. The court is governed by the law of this Circuit, and that law is as follows:

> The closing of a facility built and maintained at the expense of local taxpayers is a harsh remedy, which should only be employed if absolutely necessary to achieve the [constitutional or statutory] goal ... after all other reasonable alternatives have been explored. Where a district court adopts such a measure, the inquiry before us is whether the order was an abuse of discretion.... The district court must state its justification for ordering a school closed, in order that we may properly make this determination.

*Valley v. Rapides Parish School Bd.,* 646 F.2d at 940. Thus, no matter what forms of relief plaintiffs request, the relief that the intervenor-applicants oppose—closing of the institutions—could only be granted after all other reasonable alternatives had been considered and rejected.

Moreover, there is reason to believe that plaintiffs are not so single-mindedly and uncompromisingly pursuing that extreme form of relief as the applicants claim. *See* Second Amended Complaint, ¶¶ 71, 72, 80, 127. It is not uncommon for plaintiffs to ask for more relief in a complaint than that to which they believe they are entitled. They do so in order to maximize their bargaining leverage or in order to preserve

their options should discovery turn out to confirm their wildest fears. A much more salient feature than school closing in plaintiffs' pleadings is the repeated demand for individualized treatment. In their prayer for relief plaintiffs emphasize the need for preparing "individualized evaluation and habilitation plans," and for having parents and guardians of class members participate in the preparation of such plans. Second Amended Complaint, pp. 33–36, ¶¶ 7, 8, 9, 16, 18, 19, 23. Since a right to "individualized treatment and decent care" is the only right intervenors even claim to be entitled to, it is doubtful that plaintiffs have threatened that right.

Furthermore, the defendants and plaintiffs in this case have already stipulated—and so stipulated before this class was certified—that they would protect the rights of individual class members to individualized appropriate care, including, necessarily, the right of a member to be institutionalized should that prove to be the only appropriate care for him or her, in the following fashion:

> Defendants and plaintiffs are further agreed and stipulate that in fashioning

... ultimate relief which may be found to be appropriate, if any, the needs of the individual class members, including, for example, the following categories, will be considered.

  1. Self-help skills, academic skills and vocational needs
  2. Sensory Impairment needs
  3. Mobility Impairment needs
  4. Communication needs
  5. Emotional and behavioral needs
  6. Residential placement needs
  7. Medical needs
  8. Recreational needs

Stipulation of July 10, 1981, p. 1.

In sum, it is doubtful that plaintiffs are threatening any true right of applicants, it is certain that defendants are adequately representing the applicants in securing for them any right they may have, and it is likely that those rights have already been protected and guaranteed by stipulation.

Under the circumstances, it is concluded that intervenors have practical representation in this suit by existing parties with respect to their concerns about school closings.[1] They are, of course, free to supple-

---

1. In this court's July 9, 1981, order denying intervention to the previous intervenor-applicants, it cited as an authority *Halderman v. Pennhurst State School & Hospital,* 612 F.2d 131 (3d Cir.1979) (*en banc*). In *Halderman,* a class action suit filed on behalf of residents of a Pennsylvania state mental institution, the Pennhurst Parent-Staff Association ("P.P.S.A.") sought to intervene following entry of judgment to represent interests apparently similar to those espoused by P.A.R.T. in this case. The district court denied the application as untimely. On appeal, the Third Circuit, sitting *en banc,* found that the application was, in fact, timely, but affirmed the denial of intervention, because the position of the applicants was adequately represented by the state defendants. 612 F.2d at 134. (The applicants were, as here, permitted to file a brief amicus curiae.) That case has not been reversed and is still sound law. *See, e.g., Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania,* 674 F.2d 970, 974 (3rd Cir.1982).

  The Supreme Court, when it heard the *Halderman* case, *Pennhurst State School v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), granted P.P.S.A. permission to intervene without opinion. This could have been permissive intervention. The role of an inter-

venor in the Supreme Court bears little resemblance to the role of an intervenor in a district court.

  Upon remand, the district court granted P.P.S.A. permission to intervene "in the relief stages of this litigation", for the limited purpose of participating "on a 'case-by-case basis' in the assessment of each individual class member's particular needs." *Halderman v. Pennhurst State School,* No. 74–1345, Memorandum Opinion, p. 5 (February 22, 1980). This, too, might have been permissive intervention.

  When the case again came before the Third Circuit, that court permitted, again without opinion, P.P.S.A. to continue in its intervenor status. It by no means reversed its earlier published opinion, which this court follows.

  It is abundantly clear from the substance of this opinion that the value of precedent on a motion to intervene is limited, since one must be deeply involved in a litigation in order to know whether or not an applicants' interests are adequately represented by existing parties and whether, even if they are, permissive intervention still ought, under all the circumstances, to be granted. Even in the *Pennhurst* case, which has certain obvious parallels to this case, there are significant distinguishing factors.

ment this representation with amicus briefs.

B. *P.A.R.T.'s interest in improving conditions at the state schools, to the extent that P.A.R.T. has such a good faith interest, is adequately represented by plaintiffs.*

P.A.R.T. has argued that the defendants in this case do not represent them because of the position they take in the following sentence, already quoted:

> to the extent that plaintiffs are able to prove a failure by defendants to provide adequate care and habilitation, the deficiencies can and must be corrected.

Complaint in Intervention, ¶ 6. They argue that the defendants, in contrast, "flatly deny" the existence of all such deficiencies.

First of all, by their own pleading the applicants make clear that all responsibility for proving deficiencies and improving conditions will remain upon the shoulders of plaintiffs, so it is a tautological truth that intervenors are adequately represented by plaintiffs with respect to their interest in improving conditions.

Furthermore, the recitation of that one sentence in the applicants' "complaint" opens up no great chasm between the intervenors and the defendants, who otherwise fully represent their interests. It is true that the defendants' answer denies all wrongdoing and admits lack of knowledge—as does the intervenors' "complaint"

—of many of the plaintiffs' specific factual allegations. Such blanket denials of responsibility are common in defendant pleadings even where defendants are quite willing and interested in improving deficiencies that might currently exist. The plaintiffs in their pleadings have alleged shocking and cruel inhumanities that class members have been subjected to—e.g., diseases due to lack of sanitation, unsafe buildings, homosexual assault, or being tied to a bed for two years. It defies belief to assume that the defendant Texas state officials in charge or their attorneys seriously would oppose efforts to correct such "deficiencies" in an injunctive suit if they should turn out in fact to exist.

Nevertheless, the P.A.R.T. applicants shamelessly suggest that their sympathy for such minimal improvements prevents their interests from being adequately represented by defendants since defendants have an "adverse interest." *See, e.g., British Airways, supra,* 71 F.R.D. at 585.

Under the unusual circumstances of this motion to intervene, where applicants' sympathies with plaintiffs amount to nothing more than a formal incorporation of portions of plaintiffs' complaint, the court without hesitation holds that certain of the applicants' interests are, as a practical matter, adequately represented by plaintiffs, while certain of their interests are, as a practical matter, adequately represented by

---

The P.P.S.A., for instance, explicitly represents the interests of staff and parents as well as the interests of children, whereas it is the court's understanding that P.A.R.T. purports only to represent the interests of certain children. If P.A.R.T. is representing the interests of staff in this case, it is doing so in an underhanded manner.

In an affidavit appended to P.A.R.T.'s Memorandum ... in Support of Motion to Intervene, Joel Klein, Esquire, P.A.R.T.'s attorney, adverts to *Pennhurst* and two other cases in which "we filed" motions to intervene that were granted—all of them without opinion. In that affidavit, the word "we" refers not to P.A.R.T., which is a local Texas group, but to his law firm. Since all of these motions were granted without opinion, it is impossible to tell whether those interventions were of right or were permissive, and it is impossible to tell to what extent, if any, those cases can be said to mirror this one. The resemblance would have to be virtually exact

to make those cases relevant. Certainly, the fact that Mr. Klein represented all of these clients is of little probative value. If Mr. Klein's underlying premise is that all of his clients are linked together by an ideological thread, then that has disturbing implications with respect to his position in the *Lelsz* case. In *Lelsz,* for instance, he claims that the interests of his clients are not represented by the state defendants because of their plaintiff sympathies, and yet in *Pennhurst* the interests of his clients were so identical to those of the state defendants that the two groups submitted joint briefs to both the Supreme Court and, upon remand, the Third Circuit. Therefore, even if the court could attach weight to the successes of the law firm P.A.R.T. retains, and even if it could assume that all of his clients have essentially identical and interchangeable interests, it would first like to indulge in a much closer examination of that law firm's other clients.

defendants. Rule 24(a)(2) requires only that the applicants' interests be adequately represented by "existing parties," not by "one existing party."

Alternatively, the applicants sophistically argue that it is "simply illogical" to suppose that the intervenors, as class members, can be formally represented by plaintiffs and yet, for purposes of their intervention motion, be practically represented by defendants. Yet this is precisely the situation the Fifth Circuit has confronted and affirmed consistently in each and every school desegregation case cited above. In each instance parents sought to intervene on behalf of their children, who were class members and formally, therefore, plaintiffs. In each instance the parents were denied the right to intervene because, as a practical matter, the defendant school board adequately represented their interests or those of their children. In each instance the class relief was granted. There was no true conflict in any of these cases, and there is none in the case at hand, since representation of the applicants' interests need only be practical, not formal. *See Dierks v. Thompson,* 414 F.2d 453 (1st Cir.1969) (a subclass of absentee class members with interests adverse to those of the named class representatives were adequately represented by defendants).

Lastly, the applicants' contention that the defendants cannot adequately represent them because of their sympathies for the plaintiffs is further weakened by the remainder of applicants' arguments, which manifest stronger defendant propensities than applicants admit to in their pleading.

First, the P.A.R.T. applicants, while professing to join plaintiffs in seeking "corrections" of "deficiencies," propound two legal theories in their Memorandum ... in Support of Motion to Intervene (both of which are also propounded by defendants, Defendants' Answer, ¶¶ 2 and 3) supporting the proposition that a federal court cannot order relief to the plaintiffs under relevant state statutes. The first theory is the abstention doctrine and the second is an interpretation of the Eleventh Amendment to the United States Constitution. Memorandum ... in Support of Motion to Intervene, pp. 13–14, n. 3. If the applicants seek to improve conditions and remedy deficiencies, it is unclear why the children would care whether that relief was granted pursuant to federal law or pursuant to state law.

Second, the intervenors, while, again, professing to act on behalf of retarded children who seek to remedy existing deficiencies, have in fact sought to prevent any photographs and films from being made which could prove and document the existence of those deficiencies. They assert a "privacy" right on behalf of the retarded children to resist this discovery, even though the parties are agreed that such photographs or films would not be made public but would be used solely for the purposes of this lawsuit. Why would these children who seek improvements throw such obstacles in their own path?

In view of the pedigree of this motion to intervene, and in view of the conceded affinity between these applicants and previous applicants, and in view of the goal of the previous applicants to dismiss the suit in its entirety, that portion of the P.A.R.T. applicant's petition professing a sympathy to plaintiffs' cause is found to be not only duplicative of portions of plaintiffs' case, but wholly parasitic to it. It is parasitic in that the applicants are using plaintiffs' complaint only for its own transitory strategic purpose of simulating an interest adverse to defendants. Their ultimate goal continues to be the sabotaging of plaintiffs' case. A parasitic recitation of portions of plaintiffs' case creates no adverse interest on the part of defendants which would prevent the defendants from adequately representing applicants' interests in resisting the closing of the three institutions.

C. *P.A.R.T. has no further interest that will not adequately be served by the filing of amicus briefs.*

Class action injunctive suits seeking institutional reform—the so called "public law

litigation"[2] or "structural reform"[3] suits—tend to draw in intervenor-applicants in an ever-widening, self-destructive whirlpool. Courts must exercise control over the lawsuit to keep it manageable while ensuring that all legally cognizable interests are represented and protected. Despite the terminology "intervention of right," the Fifth Circuit has indicated that the court's inquiry into such a proposed intervention is to be " 'a flexible one, which focuses on the particular facts and circumstances surrounding each application,' and this type of intervention 'must be measured by a practical rather than technical yardstick.' " *United States v. Perry County Bd. of Educ.,* 567 F.2d at 279, quoting *United States v. Allegheny-Ludlum Indus., Inc.,* 517 F.2d 826, 841 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). As has already been observed, the Fifth Circuit has upheld district court denials of such intervention in the context of school litigation virtually without exception. Typical of those cases was *Jones v. Caddo Parish School Bd.,* in which the Fifth Circuit cited with approval the district court's order denying intervention to a group of parents protesting the closing of a neighborhood school:

> . . . we find that these parties along with teachers, bus drivers, lunchroom personnel and students and parents of students in other schools in Caddo Parish, Louisiana, are properly and adequately represented by the Defendant Caddo Parish School Board; that all interested parties have received repeated public invitations and many have appeared before the Court's committee and given it the benefit of their views, that it is inevitable that groups or segments of these parties will be offended by any plan which may be adopted, that all such parties will be and have been allowed to file opposition to the plan adopted by the committee, that the Court will and is considering opposition so filed and that therefore it is unnecessary and improper that these parties

be allowed to intervene as parties defendant.

487 F.2d at 1277. The district court there was pointing out that judges have at their disposal many other techniques short of formal intervention that will adequately protect the myriad interests ultimately implicated by the radiating consequences of any relief in such suits. As Professor Chayes wrote in a now famous law review article:

> The characteristic features of the public law [suit] are very different from those of the traditional [suit]. The party structure is sprawling and amorphous, subject to change over the course of the litigation. The traditional adversary relationship is suffused and intermixed with negotiating and mediating processes at every point. The judge is the dominant figure in organizing and guiding the case, and he draws for support not only on the parties and their counsel, but on a wide range of outsiders—masters, experts, and oversight personnel.

Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281, 1284 (1976). What is crucial is that all legally relevant interests be presented to the court. Developments in the Law—Class Actions, 89 Harv.L.Rev. 1318, 1475 (1976). Due process and fairness require that, no less and no more.

This court has taken several steps to ensure that all legally relevant interests are brought before it. First, it has granted leave to three groups to submit briefs amicus curiae to the court. In doing so, it has followed the sound considerations Judge Wyzanski has set forth for guidance as to whether, in the court's discretion, permissive intervention or amicus curiae status was to be preferred:

> It is easy enough to see what are the arguments against intervention where, as here, the intervenor merely underlines issues of law already raised by the primary parties. Additional parties always take additional time. Even if they have no witnesses of their own, they are the

---

2. Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281 (1976).

3. Fiss, Foreword: The Forms of Justice, 93 Harv.L.Rev. 1 (1979).

source of additional questions, objections, briefs, arguments, motions and the like which tend to make the proceeding a Donnybrook Fair. Where he presents no new questions, a third party can contribute usually most effectively and always most expeditiously by a brief amicus curiae and not be intervention.

*Crosby Steam Gage & Valve Co. v. Manning, Maxwell & Moore, Inc.,* 51 F.Supp. 972, 973 (D.Mass.1943); *British Airways, supra,* 71 F.R.D. at 585.

On July 9, 1981, as already noted, the first intervenor-applicants in this case were granted leave to file briefs amicus curiae with the court. They have not done so. Nevertheless, because of the court's view of the close affinity between those applicants and the P.A.R.T. applicants, that order must be interpreted to permit the P.A.R.T. applicants to submit such a brief.

On December 14, 1981, the application of Advocacy, Inc., to proceed as an amicus curiae was also granted. Advocacy, Inc., is a federally funded non-profit corporation established to implement the Texas Advocacy and Protective Services System pursuant to Public Law 94–143, the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6001 *et seq., as amended by* the Comprehensive Rehabilitation Services Amendments of 1978, Public Law 95–602. This organization has a federal statutory mandate, 42 U.S.C. § 6012, to advocate and protect the legal rights of developmentally disabled. Their Board of Directors consists of members appointed by the State Bar of Texas, the Texas Association for Retarded Children, the United Cerebral Palsy Association of Texas, the Epilepsy Association of Texas, the Texas Society for Autistic Citizens and the Texas Developmental Disabilities Planning Council. Since its inception in 1977 this organization has responded to over 7,000 individual requests for assistance from individuals alleging inappropriate institutionalization, institutional abuse, and other matters pertinent to this lawsuit.

On January 27, 1982, the application of the Association for Retarded Citizens/Texas ("ARC/Texas") to proceed as amicus curiae was granted, and on April 15, 1982, that organization submitted a significant forty-four page brief outlining its perspective on the issues presented by this lawsuit. ARC/Texas is a non-profit Texas corporation, now in its thirty-third year of existence, with 10,000 members and seventy-five member chapters across the state. It is the state member unit of ARC/United States. Over half its members are parents of retarded children, and the remainder are family members, community and civic organizations, professionals in the field of mental retardation services, interested citizens, and persons who are themselves considered retarded.

The credentials of both Advocacy, Inc., and ARC/Texas are such as to suggest that they could each amount at least as cogent a case for permissive intervention as P.A.R.T., but both have indicated satisfaction with amicus status. The court has not discriminated against P.A.R.T., but has invited it to submit its views on an equal basis with other parents and citizens who have an equal stake in this suit.

Finally, the court decided on September 2, 1981, *sua sponte,* to order the appointment of an independent expert to perform a thorough, unbiased study of the care and habilitation provided by the three schools in question. With the agreement of both parties, the court named Earl Butterfield, Ph.D., to serve as that expert. Dr. Butterfield is currently a professor in the College of Education, Division of Educational Psychology, at the University of Washington, in Seattle. Prior to his association with the University of Washington, he was affiliated with the University of Kansas and the Kansas Bureau of Child Research. There, he was Co-Director of the Ralph L. Smith Center for Research in Mental Retardation and Human Development (1973–1981), and Chief of the Section on Behavioral Sciences and Services, Department of Pediatrics, University of Kansas Medical Center (1974–1981).

Dr. Butterfield has been honored by the American Psychological Association and is a

past president of that association's Division of Mental Retardation. He has served as a consultant on the evaluation of residential facilities for the mentally retarded to the Joint Commission for the Accreditation of Hospitals in 1970. He testified as an expert witness for the United States Department of Justice and for the American Civil Liberties Union in the class action styled *Parisi v. Rockefeller,* reported *sub nom. New York State Association for Retarded Citizens v. Rockefeller,* 357 F.Supp. 752 (E.D.N.Y. 1973), which challenged conditions at the Willowbrook State School for the Mentally Retarded in New York State. He also served as an expert witness for the Mental Health Law Project and the United States Department of Justice in the case *Wyatt v. Hardin,* reported *sub nom. Wyatt v. Stickney,* 344 F.Supp. 387 (1972), *modified sub nom. Wyatt v. Aderholt,* 503 F.2d 1305. Wyatt sought to reform Partlow State School in Alabama.

The court ascribes no mysterious powers to experts and realizes that they do not transcend, let alone replace, adversarial debate. Nevertheless, the court invited such an independent fact-finder because of its concern that no relevant fact escape illumination because of the adversarial slants of the particular parties. Dr. Butterfield has manifested to the court his intention to

> select people [to assist him] who have first hand experience with residential facilities and who have not identified themselves with either extreme of the continuum of opinion about the value of institutional care for mentally retarded people. I will also select people who have exceptionally strong credentials, including national recognition whenever possible, and people who have shown through their professional work that they can collect and evaluate evidence objectively. These guidelines rule out any number of expert witnesses from related cases . . .

Letter from Butterfield to the undersigned judge, January 15, 1982.

Because of the fact-finding and legal advice accessible to the court through the two parties and three amici curiae, and because of the supplementary factual investigation performed by the expert, and because, as a practical matter, the interests of the applicants are fully represented by existing parties, it follows that intervention of right is unavailable to the applicants and that permissive intervention should also be denied.

D. *If the P.A.R.T. applicants are or must be deemed to be completely independent from the initial intervenors, then their petition is untimely.*

It has been found that there is a close affinity between the P.A.R.T. applicants and the previous applicants for intervention. Nevertheless, P.A.R.T. has sought to minimize the connection between the two sets of applicants, and it stresses that "there is no [formal] overlap whatsoever between the parties to the first intervention effort and [themselves]." Brief for Appellants, p. 25.

■ If this is true, their application must be denied as untimely. *N.A.A.C.P. v. New York,* 413 U.S. 345, 365, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973); *Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977); *Smith Petroleum Service, Inc. v. Monsanto Chemical Co.,* 420 F.2d 1103, 1115 (5th Cir. 1970). The P.A.R.T. motion to intervene was filed three years after the Second (and final) Amended Complaint, and six years after the applicants had actual knowledge of this suit and fully appreciated its potential impact upon them. *See Stallworth,* 558 F.2d at 264–265. Instead of moving to intervene at that point, they decided to rely upon the filing of the previous applicants for intervention. Reply Brief for Appellants, pp. 9–10 and n. 13. Obviously they felt that those applicants were representing interests essentially identical to their own. Only upon the denial of that motion did the current intervenors decide that their interests were somewhat distinguishable. But if their interests were in fact distinguishable, then they should have moved to intervene six years ago.

Even though the case has not yet come to trial, the parties have made substantial progress during the past six years (especially the last three years) in ways that will be

upset and, perhaps, nullified if current applicants are now permitted to intervene as full parties. *See Stallworth,* 558 F.2d at 265. As sometimes happens in injunctive civil rights suits against governmental bodies, the state officials, because of their own interest in promoting the public welfare, have manifested a willingness to cooperate to rectify voluntarily any obvious deficiencies that might be found to exist, whatever their cause. There have been, in fact, settlement negotiations between the plaintiffs and the Texas officials, and such talks, always fragile and arduous, are particularly so when one party, the governmental party, is subject to budgetary constraints that it cannot set and periodic managerial changes that it cannot predict. Nevertheless, the court is informed that some progress along these lines has been made. What has been said of consent decrees in school desegregation is entirely applicable to the present dispute:

> [S]chool desegregation is one of the areas in which voluntary resolution is preferable to full litigation because the spirit of cooperation inherent in good faith settlement is essential to the true long-range success of any desegregation remedy.

*Armstrong v. Board of School Directors of the City of Milwaukee,* 616 F.2d 305, 318 (7th Cir.1980); quoted in *United States v. South Bend Community School Corp.,* 511 F.Supp. at 1355 (denying intervention to NAACP and to parents in suit in which complaint and consent order were filed the same day.)[4] *Cf. Firebird Society Inc. v. New Haven Bd. of Fire Com'rs,* 66 F.R.D. 457, 465 (D.Conn.1975) (intervention denied after settlement because "this complex web of acts in reliance upon the settlement negotiations would have to be unwoven").

Whatever progress has been made over the past three years would be jeopardized if the P.A.R.T. applicants, who fully appreciated this suit's potential impact upon them six years ago, were now allowed to intervene. Accordingly, their application is un-timely, and they are entitled to neither intervention of right nor permissive intervention. Fed.R.Civ.P. 24.

## APPENDIX

## ORDER

## July 9, 1981

The above-captioned civil suit was filed as a class action on behalf of all persons who have been, are now, or will become residents of three schools operated by the Texas Department of Mental Health Retardation. Six residents of those institutions, through their parents or guardians, have filed an application to intervene in the suit pursuant to Rule 24, F.R.Civ.P. The applicants indicate that they wish to intervene for the purposes of obtaining the dismissal of plaintiffs' claims and presenting their own claims and defenses. More specifically, the applicants seek to defend the operation of the institutions at issue and demonstrate the harmful effects of the relief requested by plaintiffs. The motion and "pleading" filed by applicants do not indicate whether they seek to intervene as a matter of right under Rule 24(a) or permissively under Rule 24(b). Plaintiffs oppose the application to intervene.

In order to intervene as a matter of right, applicants must meet each of the four requirements of Rule 24(a). First, the application for intervention must be timely. Second, the applicants must have an interest relating to the subject of the action. Third, the applicants must be so situated that the disposition of the action may, as a practical matter, impair or impede their ability to protect their interest. Finally, the applicants' interest must be inadequately represented by the existing parties to the suit. *International Tank, Etc. v. M/V Acadia Forest,* 579 F.2d 964, 967 (5th Cir.1978). If an application fails to meet one of these prerequisites, it must be denied. *Id.*

The application for intervention in the instant case founders on the fourth require-

---

4. Entry into settlement negotiations does not, of course, suggest "collusion." *United States v. American Institute of Real Estate Appraisers of National Ass'n of Realtors,* 442 F.Supp. 1072 (N.D.Ill.1977).

**26**

ment set forth above. Those seeking to intervene have the burden of showing that representation by existing parties is inadequate. *Afro American Patrolmen's League v. Duck*, 503 F.2d 294, 298 (6th Cir.1974). When applicants for intervention have the same ultimate objectives as a party to the suit, a presumption arises that their interests are adequately represented by that party. That presumption can be overcome only upon a showing of adversity of interest, collusion, or nonfeasance on the part of such party. *International Tank, Etc.*, 579 F.2d at 967, quoting *Commonwealth of Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir.1976).

The residents and parents seeking to intervene in this action assert objectives virtually identical to those manifested by the defendants in their pleadings. The applicants, like the defendants, maintain that plaintiffs' suit should be dismissed. Both the applicants and defendants defend the adequacy of the treatment and conditions within the three institutions involved. Both the defendants and applicants for intervention oppose the relief requested in plaintiffs' complaint. The applicants are so closely allied with the defendants in this action that they incorporate, in their own "pleading", the grounds for dismissal set forth by the defendants in their answer. Finally, the application for intervention contains no showing of adversity, collusion, or nonfeasance which could overcome the presumption of adequate representation created by the similarity of interest described above.

The Court of Appeals for the Third Circuit recently faced an application for intervention in a factual setting remarkably similar to that presented here. *Halderman v. Pennhurst State Sch. & Hospital*, (Application for Intervention), 612 F.2d 131 (1979) (*en banc*). In *Halderman*, a class action suit filed on behalf of the residents of a Pennsylvania state mental institution, a group including parents of institutional residents sought to intervene following the entry of judgment. The district court denied the application as untimely. On appeal, the Court found that the application for intervention was, in fact, timely filed. Nevertheless, the Court of Appeals affirmed the refusal to permit intervention on the grounds that the position of the applicants was adequately represented by the state defendants. 612 F.2d at 134. The applicants were, however, permitted to file a brief *amicus curiae*.

Since the interests of the applicants are adequately represented by the present defendants in this case, the application to intervene under Rule 24(a) must be denied. Permissive intervention under Rule 24(b) shall be denied for the same reason. The participation of duplicative parties in this litigation would unduly complicate and delay the conduct of trial, thereby prejudicing the interests of the original parties. In conformity with the approach adopted by the Court of Appeals for the Third Circuit in *Halderman*, the applicants shall be permitted to file briefs *amicus curiae* during the course of this action.

On the basis of the foregoing, it is, accordingly,

ORDERED that the motion for leave to intervene filed by Mary Margaret Searight, by and through her parents and guardians, Mr. and Mrs. Allen Searight; Linda Diane Aldrich, by and through her parents, Mr. and Mrs. Edward E. Aldrich; Charlene Medley, by and through her parents, Mr. and Mrs. A.A. Medley; James Hutcheson, by and through his mother, Mrs. Linda Hutcheson; John A. Christie, III, by and through his mother and guardian, Mrs. J.A. Christie, Jr.; and Todd Pierce, by and through his parents, Mr. and Mrs. Roger Pierce, shall be, and it is hereby, DENIED. It is further

ORDERED that the above-named individuals are, hereby, GRANTED leave to file briefs *amicus curiae* during the pendency of this action.